**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-4059**

_____

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

ESCOVIO RIOS, a/k/a Chavo,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Bryson City.  Martin K. Reidinger, Chief District Judge.  (2:12−cr−00025−MR−WCM−2)

_____

Argued:  October 25, 2022                              Decided:  December 20, 2022

_____

Before WILKINSON and DIAZ, Circuit Judges, and MOTZ, Senior Circuit Judge.

_____

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson and Senior Judge Motz joined.

_____

**ARGUED:**  Leslie Carter Rawls, Charlotte, North Carolina, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

DIAZ, Circuit Judge:

Four years into Escovio Rios's prison term for a felony drug offense, the government transferred him to Mexico to serve the rest of his sentence. But after Mexican authorities released him from prison, Rios returned to the United States in violation of his conditions of supervised release. So the district court revoked his supervised release and sentenced him to another two years in prison.

On appeal, Rios claims that a 1976 U.S.-Mexico treaty stripped the district court of its subject-matter jurisdiction to revoke his supervised release. And even if the district court did have jurisdiction, he argues, it erred in considering his "early" release from Mexican custody in imposing an upward variance.

Finding no error, we affirm.

## I.

### A.

A jury convicted Rios of conspiracy to possess with intent to distribute methamphetamine. The district court sentenced him to 151 months in prison (later reduced to 121 months) followed by five years of supervised release. The court imposed several conditions on Rios's supervised release, among them that he was "not [to] commit another federal, state, or local crime" and was to "remain outside the United States" if deported. J.A. 19.

Four years into his term of imprisonment, the government deported Rios to Mexico, his home country, to serve the rest of his sentence. A prisoner-transfer treaty between the

2

United States and Mexico authorized the transfer. Treaty Between the United States of America and the United Mexican States on the Execution of Penal Sentences, Mex.-U.S., Nov. 25, 1976, 28 U.S.T. 7399, 1977 WL 181724; *see also* 18 U.S.C. § 4100(a). The Treaty states:

> [T]he completion of a transferred offender's sentence shall be carried out according to the laws and procedures of the Receiving State, including the application of any provisions for reduction of the term of confinement by parole, conditional release or otherwise.

Treaty art. V, § 2.

The Mexican prison authorities later released Rios and he reentered the United States before his U.S. sentence expired. Authorities in Texas arrested Rios and charged him with violating 8 U.S.C. § 1326(a) and (b)(2), provisions of the illegal-reentry statute. He was convicted and the district court there sentenced him to 24 months in prison.

B.

After Rios's arrest in Texas, the U.S. probation office for the Western District of North Carolina petitioned the district court to revoke Rios's supervised release. The probation office argued Rios had violated the conditions of his supervised release by (1) committing the crime of illegal reentry and (2) returning to the United States.

At a hearing on the petition, Rios admitted that he had committed a crime by illegally reentering the country. The government agreed to dismiss the other alleged violation.

The district court determined that the Sentencing Guidelines called for a four- to ten-month sentence. Rios's counsel asked for a one-month sentence, explaining that Rios

3

had reentered the United States for medical treatment unavailable in Mexico. Counsel also noted that Rios had received a 24-month sentence in the Texas proceeding and that the violation was his first. The court responded that Rios had "received what is in essence very lenient treatment," but "essentially stuck a thumb in the eye of the American authorities by saying I'm coming back before I'm even supposed to be out of prison." J.A. 34.

The court revoked Rios's supervised release and sentenced him to another 24 months in prison—above the guideline range, but below the statutory maximum of five years. 18 U.S.C. § 3583(e)(3). The court found that Rios's "breach of trust" was "very substantial," and continued:

> Because of the immigration laws of this country, when the defendant received a substantial sentence for his drug dealing activity he was incarcerated by the Bureau of Prisons. But in conjunction with the rules of the Bureau of Prisons and the immigration officials he was allowed to return to his home country to serve his sentence, and for whatever reason in his home country they allowed him to be released and that's their prerogative. But then by coming here back to this country during that period of time, when if he is in this country he is supposed to be in prison, he has not just returned in violation of the law of Section 1326 but he has quite literally flouted the law as it was imposed upon him for his prior violation. That is something that has to be strongly deterred.

J.A. 40–41. The court also noted that Rios may have better medical care available to him in prison than in Mexico.

This appeal followed.

4

II.

A.

We first consider Rios's argument that the Treaty deprived the district court of subject-matter jurisdiction to revoke his supervised release. Though Rios didn't present his jurisdictional argument to the district court, parties may raise subject-matter jurisdiction issues for the first time on appeal. *Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011); *see also United States v. Morris*, 37 F.4th 971, 975 (4th Cir. 2022) (noting that the supervised-release statute's "jurisdictional grant is one of subject-matter jurisdiction" (cleaned up)). We review de novo whether the district court had jurisdiction to revoke Rios's supervised release. *United States v. Barton*, 26 F.3d 490, 491 (4th Cir. 1994).

The district court held it had subject-matter jurisdiction under 18 U.S.C. § 3231, which confers jurisdiction over offenses against the laws of the United States, and 18 U.S.C. § 3583, which governs the revocation of supervised release. But Rios contends that the Treaty stripped the district court of that jurisdiction upon his transfer to Mexico.

Rios points to Article V, § 2 of the Treaty, which provides that laws and procedures of the receiving state (Mexico) would govern the completion of his sentence, including "provisions for . . . conditional release." He claims that this provision means the United States "relinquished all control of [his] imprisonment and conditional release to Mexico," so Mexico had "exclusive authority" to modify the terms of his supervised release. Appellant's Br. at 10, 14.

Rios's argument finds an elephant in a mousehole. While Congress need not "incant magic words," we look for a "clear statement" that Congress intended to create a

5

jurisdictional restriction. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). The Treaty contains no such statement. Rather, the provision that Rios cites only dictates which country's laws and procedures govern how the offender's sentence is "carried out." Treaty, art. V, § 2, 1977 WL 181724; *accord* 18 U.S.C. § 4107(b)(2) (same language in the Foreign Offenders Transfer Act, the Treaty's implementing legislation).

The Fifth Circuit has explained that this language "means that Mexican law will govern the conditions of confinement and the opportunity for early release through parole or good-time credits," for example. *Tavarez v. U.S. Att'y Gen.*, 668 F.2d 805, 807 (5th Cir. 1982). But a provision dictating which country's law applies doesn't, on its own, strip another country's courts of jurisdiction. *See Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 580 (4th Cir. 2015) (noting that litigant "conflate[d] questions of choice of law with questions of subject matter jurisdiction"); *cf. Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 97 (2017) (distinguishing a "choice-of-law prescription" from a "jurisdiction-conferring provision"). So, Article V doesn't divest the district court of jurisdiction.[*]

Rios also points to Article VI of the Treaty—giving the transferring state "exclusive jurisdiction over any proceedings . . . intended to challenge, modify or set aside sentences

---

[*] A provision of the Department of Justice Manual states that when a prisoner is transferred, the sentencing country "loses jurisdiction over the prisoner's sentence, and violations of the terms or conditions of the original sentence, including supervised release, cannot be enforced even if the prisoner returns illegally to the United States after satisfying the sentence in the foreign country." U.S. Dep't of Just., Just. Manual § 9-35.014 (2020). Here, however, Rios hadn't "satisf[ied]" his sentence when he returned to the United States. *Id.* In any case, we aren't bound by the Manual's interpretation of the Treaty.

handed down by its courts"—and argues that these proceedings are the *only* circumstances in which the U.S. courts retain jurisdiction. Treaty, art. VI, 1977 WL 181724; *accord* 18 U.S.C. § 3244(1). But that doesn't make sense. A grant of exclusive jurisdiction in one section of a treaty doesn't imply the lack of concurrent jurisdiction elsewhere. *See Lu Junhong v. Boeing Co.*, 792 F.3d 805, 818 (7th Cir. 2015) ("A law granting one sort of jurisdiction does not implicitly negate others.").

Rios cites several cases explaining that a receiving country can administer a foreign sentence under its own laws. *See, e.g.*, *Asare v. U.S. Parole Comm'n*, 2 F.3d 540, 543 (4th Cir. 1993) (discussing process for applying good-time credits that a prisoner transferred to the U.S. earned abroad); *Bender v. U.S. Parole Comm'n*, 802 F.3d 690, 694 (5th Cir. 2015) (explaining how the Parole Commission sets release dates for transferred prisoners). But these cases say nothing about the jurisdiction that remains vested in the transferring country's courts over the sentences they hand down. And none deal with Rios's particular situation: when a defendant *returns* to the transferring country and violates his original sentence there. It would be odd if a transferring country, having returned an inmate to serve his sentence at home, found itself stripped of its authority to deal with violations of that sentence committed on its own soil.

In all, the Treaty doesn't strip U.S. courts of their jurisdiction—and particularly not for transferees like Rios, who return to the country before completing their original sentences. So we decline to vacate his sentence on that ground.

7

B.

Rios also asserts that his revocation sentence is plainly unreasonable because the district court improperly considered his "early" release from Mexican prison in imposing an upward variance. But the record shows that the court disapproved of Rios's behavior after he was released, not of any decisions made by the U.S. or Mexican authorities.

We review a revocation sentence to determine whether it is "plainly unreasonable" as to the applicable § 3553(a) factors. *United States v. Crudup*, 461 F.3d 433, 437 (4th Cir. 2006). First, we determine whether the sentence was procedurally or substantively unreasonable, taking "a more deferential appellate posture than we do when reviewing original sentences." *United States v. Padgett*, 788 F.3d 370, 373 (4th Cir. 2015) (cleaned up). We then determine whether any unreasonableness was "plain," i.e., clear or obvious. *Crudup*, 461 F.3d at 439.

Rios asserts procedural and substantive error, but both amount to the same complaint: that the district court shouldn't have considered Rios's "lenient treatment" and "early" release to justify an above-guidelines sentence. J.A. 34. But in considering whether to vary upward, courts may (and often do) consider a defendant's "failure to comply with the law despite previous lenient punishments." *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012); *see also, e.g.*, *United States v. Ridings*, 411 F. App'x 647, 649 (4th Cir. 2011); *United States v. Perez-Lopez*, 352 F. App'x 855, 857 (4th Cir. 2009).

It matters not that Rios's transfer and release were "governed by and fully compliant with the applicable treaty and U.S. law." Appellant's Br. at 21. The district court didn't

8

suggest that Rios's release from incarceration in Mexico was improper. Instead, the court focused on the need to "strongly deter[]" re-offense and promote respect for U.S. law—both proper factors to consider under § 3553(a). J.A. 34, 41; 18 U.S.C. § 3553(a)(2)(A), (B).

Nor is Rios correct that the district court based the sentence on its "disapproval of the transfer decisions and Mexico's incarceration term." Appellant's Br. at 24. Rather, the court disapproved of Rios's behavior after he was released.

Rios's sentence wasn't procedurally or substantively unreasonable, much less plainly so. We therefore affirm the district court's judgment.

*AFFIRMED*